UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| AMERICAN PACIFIC MORTGAGE CORPORATION; ELEMENT MORTGAGE, <br><br> Plaintiffs, <br><br> v. <br><br> EVERETT FINANCIAL INC.; LUKE WELLING; JANE/JON DOES 1-10; DOE BUSINESS/CORPORATE ENTITIES 1-10, <br><br> Defendants. | Case No. 2:21-cv-01088-TMC <br><br> ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT |

## I.    INTRODUCTION

Plaintiff American Pacific Mortgage ("APM") is a residential mortgage loan company. APM operates a branch known as "Element" in Renton, Washington. Defendant Supreme is one of APM's competitors, also operating a residential mortgage loan branch in Renton. In early spring 2021, several APM loan officers and support staff began speaking with Defendant Luke Welling, a former APM employee and then Supreme employee. Discontented with the management of APM, the employees were interested in leaving the company and, ultimately, departed to join Supreme.

But APM believed that the departure was a coordinated attack by a competitor. APM sued, claiming that Supreme and Welling (collectively "Defendants") "encouraged and

facilitated" the former APM employees to "abuse their positions of trust, exploit information they only learned as [] employees of APM, breach their contracts, encourage other employees to breach their contracts, instruct other employees to remove APM's confidential information, interfere with APM's customer relationships, and brazenly violate their duties of loyalty to their employer, APM." Dkt. 61 ¶ 4.

After several years of arbitration, discovery, and litigation, Supreme now moves for partial summary judgment, Dkt. 155, as to APM's Amended Complaint, Dkt. 61. Specifically, Supreme moves to dismiss APM's claims for 1) tortious interference with contract (including related claims for lost profits); 2) tortious interference with business expectancy (as to some of the loans); 3) unfair competition; 4) violations of the California Computer Data Access and Fraud Act (CDAFA), California Penal Code Section 502; 5) conversion; 6) conspiracy; and 7) punitive damages.

For the following reasons, the Court GRANTS Supreme's motion as to: 1) tortious interference with contract and business expectancy; 2) related lost profits 3) unfair competition; 4) CDAFA; 5) conversion; 6) conspiracy; and 7) punitive damages. The Court DISMISSES these claims for all but the eleven specific loans allegedly diverted from APM to Supreme.

## II.    BACKGROUND

The following background facts are either undisputed or viewed in the light most favorable to APM, the non-moving party. Additional material facts for each claim brought by APM are discussed in the sections corresponding to those claims.

### A.    The Parties and Relevant Employees

Plaintiff APM and Defendant Supreme operate in the residential mortgage loan origination industry. Dkt. 61 ¶¶ 2, 14. Both companies provide loans for home purchases and offer refinancing for residential mortgages. *Id.* ¶¶ 2, 3, 7, 14. Both companies operate branches

throughout the country, including locations in Renton, Washington. *Id.* ¶¶ 6, 14. APM's Element division operates its Renton, Washington office. *Id.* ¶ 6. APM's President Dustin Sheppard founded the Element division. Dkt. 155-1 at 12, 14, 16. At the time of the relevant events, Sheppard was acting head of production for all of APM. *Id.* at 5. He became President of APM in 2022. *Id.* at 12.

This dispute centers around five loan officers and two support staff who left APM's Renton office on April 30, 2021 to work for Supreme. Dkt. 61 ¶¶ 3, 15, 17, 19, 21, 23, 25, 27. Loan officers "work with borrowers to shepherd them through the loan process, to closing and funding." Dkt. 155 at 8. "Because borrowers build relationships with loan officers, often viewing the corporate entity behind the scenes as fungible, it is important to companies to recruit and retain loan officers with strong client and referral sources." *Id.* The five loan officers include Andrew Hopkins, Matt Thomas, Corey Condrin, Austin James, and Daniel Won. Dkt. 61 ¶¶ 3, 15, 17, 19, 21, 23. Andrew Hopkins joined Element as a loan officer on November 16, 2017. Dkt. 61 ¶ 17. He became a Sales Leader at the company on December 15, 2020. *Id.* Matt Thomas began working for Element as a loan officer on March 21, 2019. *Id.* ¶ 15. Thomas became a Sales Manager on December 16, 2019. *Id.* Corey Condrin also joined Element in March 2019, and became a Sales Agent on May 29, 2019. *Id.* ¶ 19. Austin James began working for Element on July 22, 2020. *Id.* ¶ 21. He became a Sales Agent for the company on December 21, 2020. *Id.* Daniel Won began working for Element on February 10, 2021. *Id.* ¶ 23. Each signed an acknowledgment that they had read the APM Employment Handbook and signed an Agreement detailing the terms of their employment. *Id.* ¶¶ 15, 17, 19, 21, 23.

Kimberly Bundrum, a loan officer assistant, began working for Element on July 1, 2020. *Id.* ¶ 25. Cindee Wilson, a loan processor, began working for Element on November 9, 2020. *Id.*

¶ 27. They both signed similar employment agreements and acknowledgements of the Employee Handbook. *Id.* ¶¶ 25, 27.

**B.    Employees' Time at APM and Decision to Leave for Supreme**

Thomas, Condrin, and Hopkins joined APM together. Dkt. 155-3 at 6–7; Dkt. 173-4 at 61. They had previously worked as a group at Mann Mortgage, another mortgage loan originator. Dkt. 155-3 at 6–7. The trio learned about the opportunity at APM through Thomas, who was friends with Defendant Luke Welling, then a loan officer at APM. *Id.* The trio decided to leave Mann for APM. *Id.*

But the loan officers became frustrated working at APM. *See, e.g.*, Dkt. 155-5; 155-6; Dkt. 155-3 at 17; Dkt. 173-4 at 61. Condrin expressed concerns with loan closing times at the company. Dkt. 155-3 at 17; Dkt. 173-4 at 61. Hopkins raised the same issues. Dkt. 173-3 at 5. Hopkins almost lost deals with friends who were real estate agents and an uncle who was "part of that team." *Id.* He "was starting to lose his confidence in some of the closings." *Id.* Hopkins also loathed the "brutal" commute from his home in Tacoma, Washington to the office in Renton. *Id.* at 15. But APM refused to open an Element office in Tacoma. *Id.*

APM knew of the concerns. Dkt. 155-1 at 26. Sheppard admitted that the loan officers were unhappy, and he conceded that such discontent could spur them to leave APM. *Id.* at 27. But APM never made any changes. Dkt. 158-4 at 21–25.

Ultimately, the loan officers began seeking other work or speaking with recruiters—some at Supreme and some at a mix of competitors. Dkt. 155–4 at 8–9; Dkt. 173-3 at 6; 173-4 at 6–7. Thomas, for example, spoke with three former colleagues at other mortgage companies about potential jobs. Dkt. 155-4 at 9.

Thomas and Condrin reached out separately to Defendant Welling at Supreme. Dkt. 173-6 at 5. As noted above, Thomas and Welling were long-time friends, and Condrin knew Welling

from their previous work. *Id.* at 5–6. The two both began speaking with Welling in February and March 2021. *Id.*; *see also* Dkt. 173-3 at 7–9, 28; Dkt. 155-3 at 24–25.

Ultimately, Thomas raised the idea that there may be an opportunity for the team to have their "own branch" at Supreme. Dkt. 173-4 at 65. Condrin decided to pursue a meeting with Welling at a local golf course on March 11, 2021. *Id.* at 67–69. The meeting went well, and the next day Condrin and Welling scheduled another lunch. Dkt. 155-3 at 23–25. Condrin invited Hopkins, who had also, separately, reached out to Welling. Dkt. 173-3 at 8–9, 12, 28. Thomas did not attend the lunch, and Condrin was unsure if Thomas wanted to join. Dkt. 173-5 at 4.

But Condrin and Hopkins continued their discussions with Welling about joining Supreme. *See generally* Dkt. 158-7; Dkt. 158-9. Condrin even began discussing employment terms with Welling. Dkt. 158-7 at 5; Dkt. 158-10. Hopkins did the same. Dkt. 173-3 at 25; Dkt. 155-4 at 10.

## C.    The Employees' Transition to Supreme

As Condrin and Hopkins began negotiating the terms of their employment with Welling and Supreme, they also began referring borrowers away from APM and to their prospective new employer. Dkt. 155-3 at 12–14; Dkt. 173-17. Thomas decided to make the leap with Hopkins and Condrin and began doing the same. *See* Dkt. 155-4 at 10–12; 13–14; 19.

The trio all signed employment agreements with Supreme in mid-April. Dkt. 173-19; Dkt. 173-20. They each chose April 30, 2021 as their end date at APM. Dkt. 155-18; Dkt. 155-19; Dkt. 155-20. James and Won also decided to leave and join Hopkins, Thomas, and Condrin at Supreme. *See* Dkt. 173-11; 173-24 at 3; Dkt. 155 at 14; Dkt. 173 at 8. Hopkins had been mentoring Won, who was new to the industry. Dkt. 155-1 at 31–32; Dkt. 155-3 at 16. Won never originated a single loan at APM. *See generally* Dkt. 155-2. James was also newer to the industry. Dkt. 155-1 at 31–32. He closed his first loan two months before leaving APM. Dkt. 155-2 at 3.

Wilson and Bundrum decided to leave as well. Wilson was Hopkins' cousin, so he had spoken with her about joining Supreme. Dkt. 158-4 at 19; Dkt. 155 at 14. Bundrum had been looking for new opportunities outside of APM like the loan officers. *See* Dkt. 155-4 at 22.

**D.    Procedural History**

On August 13, 2021, APM sued Supreme, Welling, Thomas, Hopkins, Condrin, James, Wilson, Won, and Bundrum. Dkt. 1. APM brought claims for 1) civil conspiracy; 2) tortious interference with business expectancy; 3) tortious interference with contractual relationships; 4) unfair competition, RCW 19.86.020; 5) violation of the Computer Data Access and Fraud Act (CDAFA), California Penal Code Section 502; and 6) conversion. Dkt. 61 ¶¶ 45–89.

On December 17, 2021, the former APM employees—Thomas, Hopkins, Condrin, James, Wilson, Won, and Bundrum—moved to compel arbitration of the claims against them. Dkt. 29. The Court granted the motion to compel and stayed the case. Dkt. 42. After arbitration proceedings commenced, the parties stipulated to the dismissal of all the former employees. Dkt. 49; Dkt. 50; Dkt. 51; Dkt. 52. The only remaining Defendants are Supreme and Welling. APM then moved for leave to amend the complaint, Dkt. 57, which the Court granted. Dkt. 58. APM filed its amended complaint on October 20, 2023. Dkt. 61.

After several motions for extension of time, the Court eventually set trial for August 4, 2025. Dkt. 113. The parties completed discovery, and, shortly thereafter, Supreme and Welling moved for partial Summary Judgment. Dkt. 155. Supreme moves to dismiss APM's claims for 1) tortious interference with contract (including related claims for lost profits); 2) tortious interference with business expectancy (as to some of the loans); 3) unfair competition; 4) California Penal Code Section 502; 5) conversion; 6) conspiracy; and 7) punitive damages. *Id.* To the extent these claims serve as the basis for APM's conspiracy claim, Defendants also move for partial summary judgment on that claim. *Id.*

APM responded, Dkt. 173, and Defendants replied. Dkt. 182. The briefing is complete and the motion is ripe for the Court's consideration.

## III.    LEGAL STANDARD

### A.    Jurisdiction and Applicable Law

Before addressing the motion's merits, the Court must confirm that it has subject matter jurisdiction over the parties' claims. *See United Invs. Life Ins. Co. v. Waddell & Reed Inc.*, 360 F.3d 960, 966–67 (9th Cir. 2004) ("[A] district court's duty to establish subject matter jurisdiction is not contingent upon the parties' arguments. . . ." and it generally has an obligation to establish subject matter jurisdiction "*sua sponte*, whether the parties raised the issue or not").

"[T]he burden of establishing [jurisdiction] rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). At summary judgment, the allegations in the complaint must be supported by evidence in the record. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). APM alleges in its complaint that the Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(2). Dkt. 61 ¶ 10.

The Court has diversity jurisdiction over this action because the amount in controversy exceeds $75,000 and the opposing parties are citizens of different states. APM is a California corporation that is authorized to conduct and has conducted business in the State of Washington. *Id.* ¶ 5. It is a citizen of California, with its principal place of business in California. *Id.* Supreme is a resident and citizen of Texas as a Texas corporation with its principal place of business in Dallas, Texas. *Id.* ¶ 7. Supreme is authorized to and has conducted business throughout multiple branch offices in Washington. *Id.* Defendant Welling is a resident and citizen of the state of Washington, residing in King County. *Id.* ¶ 8. The amount in controversy exceeds $75,000. *Id.* ¶¶ 76, 91. Because the Court is sitting in diversity, substantive claims are governed by state law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

1

**B.     Summary Judgment**

2

"The court shall grant summary judgment if the movant shows that there is no genuine

3

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

4

Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable

5

jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281

6

F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

7

(1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the

8

district court—that there is an absence of evidence to support the nonmoving party's case."

9

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden,

10

the non-moving party must go beyond the pleadings and "set forth specific facts showing that

11

there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The moving party is entitled to

12

judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an

13

essential element of a claim in the case on which the nonmoving party has the burden of proof.

14

*Celotex*, 477 U.S. at 323.

15

Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts"

16

will not be presumed. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Generally,

17

"'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn

18

in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477

19

U.S. at 255). "Credibility determinations, the weighing of the evidence, and the drawing of

20

legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S.

21

at 255. Consequently, in ruling on a motion for summary judgment, "a District Court must

22

resolve any factual issues of controversy in favor of the non-moving party . . . ." *Lujan,* 497 U.S.

23

at 888 (internal quotations omitted).

24

**IV.     DISCUSSION**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

A.    **Tortious Interference with Contract**

APM makes two tortious interference claims: one for tortious interference with contract, and the other for tortious interference with business expectations. Dkt. 61 ¶¶ 52–68. For the tortious interference with contract claim, APM alleges that the company had valid and enforceable employment contracts with each of the former employees. *Id.* ¶ 59. APM claims that Supreme and Welling knew of the contracts and, at minimum, "were on notice that it is standard within the mortgage industry for employees to be subject to loyalty and confidentiality agreements." *Id.* ¶¶ 61–62. APM also alleges that Supreme and Welling[1] intentionally induced the Loan Officers and support staff to breach loyalty and confidentiality provisions in their APM employment contracts by (1) transferring confidential information to Supreme, (2) diverting loans to Supreme, (3) acting as agents of Supreme, and (4) inducing one another other to resign and "undertake employment with Supreme." *Id.* ¶¶ 63–66. As APM's 30(b)(6) witness put it, "[u]tilizing Matt Thomas as an infiltrator, [Welling] incentivized Matt Thomas to go in and break his contract with Element and [APM] to recruit on behalf of Supreme Mortgage for him." *See* Dkt. 173-41 at 43.

The Court turns first to the tortious interference with a contractual relationship claim. Under Washington law, there are five elements to a claim of tortious interference with a contractual relationship or business expectancy:

> (1) [T]he existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or

---

[1]  APM argues that Welling (and the loan officers) acted as agents of Supreme. Dkt. 173 at 11. The Court finds that APM has offered sufficient facts to support that Welling was an agent of Supreme. *See Wash. Imaging Servs., LLC v. Wash. State Dep't of Rev.*, 171 Wn.2d 548, 562, 252 P.3d 885 (2011) (a showing of agency requires "facts or circumstances that establish that one person is acting at the instance of and in some material degree under the direction and control of the other.") (citation modified).

expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Ocean Beauty Seafoods LLC v. CAPTAIN ALASKA*, 603 F. Supp. 3d 1005, 1011 (W.D. Wash. 2022) (quoting *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 351, 144 P.3d 276 (2006)). The parties do not dispute that the employees had contracts with APM. Nor do they dispute that Defendants knew of the relationship. The parties do, however, dispute whether Defendants induced the loan officers to breach terms of their contracts with APM. The Court takes each alleged breach in turn.

  1. *Duty of Loyalty*

APM claims that "Defendants entirely ignore the duty of loyalty that the former APM-employees owed to APM while employed." Dkt. 173 at 15.[2] In reply, Defendants point out that the duty of loyalty comes not from a provision of the employee's contracts, but rather from common law. Dkt. 182 at 8–9 (citations omitted). And "[b]ecause APM cannot point to any contractual provision the Loan Officers' alleged solicitation breached, summary judgment is warranted." *Id.* at 9.

The Washington Supreme Court has explained that "[e]mployers and employees have reasonable expectations of one another." *David v. Freedom Vans LLC*, 4 Wn.3d 242, 244, 562 P.3d 351 (Wash. 2025). Specifically, "[e]mployees work for employers with expectations of being paid, and employers hire employees with expectations that those employees do not act in ways that would affirmatively detract from the employer's business." *Id.* These expectations are "part of the common law duty of loyalty." *Id.* And "[e]mployers may impose restrictions consistent with the common law duty of loyalty, but the legislature requires this duty to be

---

[2] The Court excluded APM's industry expert, Michael Arnall. *See* Dkt. 193. Accordingly, his report's opinions about the duty of loyalty are not considered here.

ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT - 10

narrowly construed." *Id.* (citing RCW 49.62.070(2)(b), .005(3)). This means that "an employee owes his or her employer a common law duty of loyalty even in the absence of a contractual obligation not to compete." *Compuvest Corp. v. Dolinsky*, No. C07-1524RAJ, 2009 WL 1604525, at *2 (W.D. Wash. June 5, 2009) (citing *Kieburtz & Assocs., Inc. v. Rehn*, 68 Wn. App. 260, 265, 842 P.2d 985 (1992)). But, notably, this duty only exists "[d]uring the period of his or her employment," not after the employee has left the employer. *Kieburtz*, 68 Wn. App. at 265.

First, because the duty of loyalty terminates at the end of employment, any actions taken by the loan officers after they left APM are outside the duty's ambit. *See id.* At most, the duty of loyalty would cover clients that the loan officers solicited or referred while still at employed at APM. *See id.* Supreme does not dispute claims based on the diversion of specific loans from APM to Supreme may proceed to trial.

Second, while APM is correct that there is a common law duty of loyalty, APM has not brought such a claim. *See generally* Dkt. 61. Rather, APM has brought a claim for tortious interference with contract. *See id.* ¶¶ 58–68. Consequently, the Court finds that the duty of loyalty cannot serve as a basis for any of APM's tortious interference with contract claims. *See, e.g.*, *Omega Morgan, Inc. v. Heely*, No. C14-556RSL, 2015 WL 1954653, at *6 (W.D. Wash. Apr. 29, 2015) (bringing a duty of loyalty claim); *Compuvest Corp.*, 2009 WL 1604525, at *2 (similar).

### 2. Confidentiality Provisions

APM also argues that Defendants induced the loan officers to violate the confidentiality provisions of their employment contracts and agreements. Dkt. 173 at 19. APM states that "Loan Officers downloaded closed loan lists belonging to APM prior to leaving and Supreme used this confidential borrower information." *Id.* As support, APM points to evidence in which Welling

provided and instructed the former APM employees to have APM clients submit (or resubmit) loan applications through Welling's personal link with Supreme. *Id.*

Two provisions are relevant here. The first is Article 6 of the loan officers' employment contracts:

**Ownership of Customer Records Section 6.01**

Any and all records or books relating in any manner whatsoever to the business of Employer, including but not limited to; literature, forms, manuals, records, lists, supplies, memoranda, and other electronic computer media (collectively "Customer Records") shall be the permanent and exclusive property of Employer and shall be used exclusively for the employer's benefit (except as noted in this paragraph). This includes Customer Records generated by Employee while employed by Employer; as such Customer Records are the exclusive property of the Employer. Employee shall return to Employer all active and closed mortgage loan files and other Customer Records immediately upon termination of employment and is thereafter expressly prohibited from using such Customer Records for any purpose whatsoever. Note: Nothing in this paragraph is intended, or shall be construed, to prohibit the Employee from maintaining a separate database of Employee's own clients and referral sources, and to maintain ownership and control of that database upon termination of his/her employment at APMC.

Dkt. 172-4 at 6; Dkt. 172-5 at 6.

The second provision comes from the employee manual:

**CONFIDENTIAL INFORMATION**

I am aware that during the course of my employment, confidential information will be made available to me for instance, marketing strategies, customer lists, pricing policies and other related information. I understand that this information is proprietary and critical to the success of APM and must not be given out or used outside of APM's premises or with non-APM employees. In the event of termination, whether voluntary or involuntary, I agree to immediately return any such information in my possession to APM. I further agree not to utilize or exploit confidential information obtained during my employment at APM to the advantage of any other individual or company.

Dkt. 172-4 at 7.

APM has provided evidence to raise a question of material fact as to whether the employees violated these contract provisions. The provisions make clear, first, that customer

records are the sole possession of APM, and second, that those records must not be shared outside of APM. *See* Dkt. 172-4; Dkt. 173-4. And APM has offered evidence that the former loan officers did share customer records with Supreme. *See, e.g.*, Dkt. 173-3 at 18–19, 21–22; 173-10 at 36–37. The loan officers have each conceded that they downloaded closed loan lists belonging, at least in part, to APM before leaving. Dkt. 173-3 at 16–19; Dkt. 173-10 at 36–39; Dkt. 173-4 at 46–49; Dkt. 173-41 at 123. And APM points to at least two loans that originated at APM but were closed at Supreme. *See* Dkt. 173-33; Dkt. 172-3. This is sufficient to raise a question of material fact as to whether Defendants tortiously interfered with the loan officers' contracts with Supreme.

But, as Supreme explains in reply, "[n]owhere does APM contend the Loan Officers took or used confidential information beyond specific borrower information or specific leads. APM's damages are thus limited to the 11 loans involving these specific borrowers[.]" Dkt. 182 at 13. The Court agrees that APM has offered no evidence that the loan officers took or used confidential information in violation of the provisions outside the diverted loans. The provision itself explains that it should not be construed "to prohibit the Employee from maintaining a separate database of Employee's own clients and referral sources, and to maintain ownership and control of that database upon termination of his/her employment at APMC." Dkt. 172-4 at 6. The loan officers testified that they each brought lists of clients with them to APM and left with those same lists. Dkt. 173-3 at 16 ("Q. Did you take lead lists with you when you joined Supreme? A. I did not take lead lists. I took my previous clients that I closed. I had an Excel sheet with their first name, last name, phone, and e-mail. So as I closed them, I would put them in an Excel and I would add to that, of course, as closings went through. . . . . Q. Did you take essentially a closed loan list? A list of consumers for whom you had closed loans? . . . . A. . . . I took a list of my clients that I had closed, that I had originated loans for."); Dkt. 173-4 at 47–48; Dkt. 173-10 at 36

("I maintained a database of past clients . . . an excel spreadsheet"). And as explained further below, APM has not identified any confidential information that the loan officers took with them when they left other than the diverted loans. *See infra* Sec. IV.E.

Accordingly, violation of the confidentiality provisions can serve as a basis for APM's tortious interference with contract claim, but only for the allegedly diverted loans.

### 3.    Non-Compete and Dual Employment Provisions

Next, APM claims that "it is indisputable that the departing employees had affirmative obligations not to compete with APM while employed by APM." Dkt. 173 at 15. APM argues that the Loan Officers, by handing off work and communicating regularly with Welling and Supreme, maintained other employment while at APM in violation of their contracts. *Id.* at 15–16. And APM maintains that Defendants induced the former APM employees to violate their employment agreement when they made a "targeted effort to recruit APM's entire branch and act as agents of Supreme while employed by APM." *Id.* at 16. Supreme responds that the "'dual-employment' provision is inapplicable on its face because the Loan Officers were not employed by Supreme until April 30, 2021, after they resigned from APM. APM cites nothing to the contrary." Dkt. 182 at 9 (citations omitted).

APM points to a provision in the loan officers' contracts which requires that they devote all of their time to APM:

> **Devotion of Entire Time Section 2.02**
>
> Employee shall devote such time, attention and energy to the performance of his/her duties as is mutually agreed upon . . . . Employee shall not maintain other employment within mortgage lending, real estate, or a related field per the Department of Housing and Urban Development (HUD) regulations. Nothing contained in this Agreement shall be construed to prohibit Employee from owning, investing in, controlling or otherwise participating in non-competing business[.] "

Dkt. 172-4 at 3; Dkt. 172-5 at 3.

The above provision bars dual employment. It does not bar the employees from departing for a competitor. But APM does not actually argue that the loan officers were employed by Supreme before April 30, 2021. *See* Dkt. 173 at 16. Rather, APM argues that Supreme "made a targeted effort to recruit APM's entire branch and act as agents of Supreme while employed by APM." *Id.* To support this claim, APM cites to emails discussing bringing on the former APM employees, emails between Supreme employees with a plan to "take over" the branch, a recruiting call, and the lunch with Welling, Condrin, and Hopkins. *Id.* But none of this is evidence that the employees were working for Supreme while still employed by APM. *See id.* It is merely evidence that the employees were considering whether to leave APM for its competitor, which they were free to do under their contracts.

### 4.    *Nonexistent Non-Solicitation Provision*

Any argument that Welling and Supreme induced the former APM employees to violate their contracts by soliciting other employees fails. The contracts did not bar the employees from soliciting others to leave with them. *See* Dkt. 155-10 at 2–3 (adding non-solicitation language to future contracts). "Because there is no contractual provision prohibiting the discussions APM cites, APM has no choice but to fall back on the broader 'duty of loyalty that the former APM-employees owed to APM while employed.'" Dkt. 182 at 9 (quoting Dkt. 173 at 15). Thus, Supreme argues, because APM cannot point to any contractual provision the Loan Officers' alleged solicitation breached, summary judgment is warranted." *Id.* at 10.

Without any non-solicitation provision in the contracts, the Court agrees. The motion for partial summary judgment on the tortious interference with contract claim is GRANTED and the claim is DISMISSED as to all but the eleven diverted loans. Any corresponding claims for lost profits are also DISMISSED.

**B.    Tortious Interference with Business Expectancy**

Defendants argue that APM's tortious interference with business expectancy claim fails because (i) Defendants did not intentionally interfere with APM's business or client relationships and (ii) APM did not have a valid business expectancy. Dkt. 155 at 21–23. APM responds that Defendants intentionally interfered with APM's business and induced the loan officers to appropriate APM's client relationships. Dkt. 173 at 11. APM maintains that "Defendants encouraged the Loan Officers to show up at Supreme with an active loan pipeline and compensated them accordingly." *Id.* at 13.

As explained above, there are five elements to a claim of tortious interference with a contractual relationship or business expectancy:

> (1) [T]he existence of a valid contractual relationship or business expectancy;
> (2) that defendants had knowledge of that relationship; (3) an intentional
> interference inducing or causing a breach or termination of the relationship or
> expectancy; (4) that defendants interfered for an improper purpose or used
> improper means; and (5) resultant damage.

*Ocean Beauty Seafoods LLC*, 603 F. Supp. 3d at 1011 (quoting *Pac. Nw. Shooting Park Ass'n*, 158 Wn.2d at 351). Here, the parties dispute all but the second prong of APM's claim.

*1.    Existence of a Valid Business Expectancy*

Defendants argue that APM cannot establish a valid business expectancy. Dkt. 155 at 23. To prove its claim, APM has "to prove that it had a valid expectancy in the continued employment of the [Renton] branch employees." *Evergreen Moneysource Mortg. Co. v. Shannon*, 167 Wn. App. 242, 258, 274 P.3d 375 (2012) (citing *Woody v. Stapp*, 146 Wn. App. 16, 24, 189 P.3d 807 (2008)). But Washington courts have held that "at-will employees do not have a business expectancy in continued employment." *Id.* (citing *Woody*, 146 Wn. App. at 24); *see also Ford v. Trendwest Resorts, Inc.*, 146 Wn.2d 146, 152 43 P.3d 1223 (2002) ("[I]n the absence of a contract stating otherwise, an employee has the absolute right to abandon his or her

employment at-will."). And, conversely, Washington courts have explained that employers do "not have a business expectancy in their future relationship with their at-will employees." *Nat'l City Bank, N.A. v. Prime Lending, Inc.*, No. CV-10-034-EFS, 2010 WL 2854247, at *5 (E.D. Wash. July 19, 2010).

APM argues that *Evergreen* is inapplicable—having only held "that a party's interference in an at-will employee's relationship with its current employer cannot give rise to a claim for tortious interference with *contractual relations*." Dkt. 173 at 17 n.7 (emphasis in original). But here, the Court considers *Evergreen*'s applicability to a claim for tortious interference with business expectancy. "A valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value." *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1188 (W.D. Wash. 2019) (citing *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 114 Wash. App. 151, 158, 52 P.3d 30 (2002)). Because employers do "not have a business expectancy in their future relationship with their at-will employees[,]" they cannot have a valid business expectancy in an employee's future earnings for the company. *See id.* (citing cases).

That is not to say that APM lacks any business expectancy in the loan officers' work. "An enforceable contract is not required to support a tortious interference action." *Id.* (citing *CaptiveAire Sys., Inc. v. ITW Food Equip. Grp., LLC*, C09-0244JLR, 2009 WL 10676075, at *6 (W.D. Wash. Sept. 28, 2009)). Rather, "all that is required is a relationship between parties contemplating a contract, with at least a reasonable expectancy of fruition." *Id.* (citing *Broten v. May*, 49 Wash. App. 564, 569, 744 P.2d 1085 (1987)). Thus, "interference is intentional if the defendant desires to bring it about or if the defendant knows that the interference is certain or substantially certain to occur as a result of its action." *Id.* at 1188–89 (citation omitted).

1            Accordingly, as in *Evergreen*, if APM can "come forward with evidence showing it had

2  an expectancy interest in at least one of the [diverted] loans," it will have "raise[d] a question of

3  material fact as to the interference with business expectancy[.]" 167 Wash. App. at 259. And

4  APM has done that here. APM has raised an issue of material fact as to whether Defendants

5  interfered with business expectancy for the loans that were diverted to Supreme.

6            In Condrin's deposition, he explained that there are three scenarios in which a loan could

7  be diverted: 1) if the borrower is "in the inquiry stage"; 2) if the borrower is "reapproved and out

8  shopping"; and 3) if the borrower is "under contract but the closing date is far enough down the

9  road to where there isn't an element of time creating an issue for closing on time." Dkt. 173-4 at

10  34. And Condrin, along with the other loan officers, conceded that he referred clients to Supreme

11  while still at APM. Dkt. 155-3 at 12–15; Dkt. 155-4 at 13–15. Thomas conceded that some

12  borrowers may even have filled out applications with APM that were then restarted at Supreme.

13  Dkt. 155-4 at 13–15; Dkt. 155-3 at 14–15 (similar for Condrin). This testimony shows that APM

14  had "a relationship between parties contemplating a contract, with at least a reasonable

15  expectancy of fruition." *Bombardier*, 383 F. Supp. 3d at 1188 (citation omitted).

16            Thus, while APM cannot claim a business expectancy or lost profits in the loan officers'

17  future work for the company, APM can claim a business expectancy in the diverted loans. And

18  APM has offered evidence to raise a question of material fact as to whether it had a reasonable

19  business expectancy in any of the diverted loans.

20         2.    *Intentional Interference with Business Expectancy*

21            APM has also provided evidence sufficient for a factfinder to conclude that Defendants

22  intentionally interfered with their business expectancy in the diverted loans. Welling provided

23  his link to the loan officers to send transitional clients from APM to Supreme. Dkt. 173-4 at 36–

24

37; Dkt. 173-5 at 11; Dkt. 173-6 at 10. And Supreme offered the loan officers bonuses for the

diverted loans. Condrin explained the process in his deposition:

> Q. Was there compensation provided during the transition process for loans that were taken from the APM pipeline and moved to Supreme? . . .
>
> A. Yes. Those were paid as a sign-on bonus. . . .
>
> Q. What do you recall discussing with Supreme about the existence of that source of potential income before you joined?
>
> A. The way the [Nationwide Multistate Licensing System and Registry] has it set up is the person of record on the file is the one to get paid. So even if someone at Supreme had started a transaction and I were to join up one day after the initial disclosures go out, it's too late to make that switch. So there's no way to compensate that person for that transaction.
>
> Q. . . . Meaning, . . . if you had joined one day after, you are the person who could not get compensated even if you did the whole deal; is that right?
>
> A. Correct. . . . And so if you were to offer a signing bonus in direct proportion to what the commission would have been, that would be a way to offset that.

Dkt. 173-4 at 28–29. Condrin received such a bonus. *Id.* at 29.

This evidence is enough to raise a genuine dispute of a material fact. *See Villiarimo*, 281

F.3d at 1061. Thus, APM has raised questions of material fact as to Supreme's interference with

the eleven diverted loans. But APM has failed to offer evidence to support its claims as to future

loan production for the loan officers. Accordingly, summary judgment is GRANTED on the

claim for all but the eleven diverted loans.

C.      **Unfair Competition**

The Court turns now to APM's unfair competition claim under Washington's Consumer

Protection Act ("CPA"). The CPA requires that a plaintiff prove "(1) an unfair or deceptive act

or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a

person's business or property, and (5) causation." *Ride the Ducks Seattle LLC*, 647 F. Supp. 3d at

1054 (citing *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37, 204 P.3d 885 (2009)). The

first three elements "may be established by a showing that the alleged act constitutes a *per se* unfair trade practice." *Est. of Coineandubh v. Boeing Emps. Credit Union*, No. 3:19-CV-05527-RBL, 2019 WL 3859726, at *5 (W.D. Wash. Aug. 16, 2019) (quoting *Hangman Ridge*, 105 Wn. 2d at 786) (emphasis added).

"In addition to establishing a *per se* violation of the CPA, a plaintiff may establish that an act was 'unfair or deceptive' although not prohibited by statute." *Sutter*, 2023 WL 3872202, at *6 (citing *Klem v. Washington Mut. Bank*, 176 Wn.2d 771, 785, 295 P.3d 1179 (2013)). The first element requires "an unfair or deceptive act or practice." *Hangman Ridge*, 105 Wn.2d at 785. The element may be satisfied one of three ways: a per se violation of a statute (as explained above), "an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of public interest." *Klem*, 176 Wn.2d at 787.

A plaintiff "may satisfy the first element of a private CPA claim—an unfair or deceptive act—in a number of ways." *Greenberg*, 3 Wn.3d at 481 (Madsen, J., concurring). A plaintiff may allege that an act "is in violation of the public interest." *Id.* (first citing *Klem*, 176 Wn.2d at 787, 295 P.3d 1179; and then citing 16 David K. DeWolf & Keller W. Allen, Washington Practice: Tort Law and Practice § 8:5, at 445–46 (5th ed. 2023–24)). Or a plaintiff may claim that an act is "unethical, oppressive, or unscrupulous[.]" *Id.* (quoting *Magney v. Lincoln Mut. Sav. Bank*, 34 Wn. App. 45, 57, 659 P.2d 537 (1983)). A plaintiff may also allege that the acts "cause or are likely to cause 'substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits' to consumers or to competition." *Id.* (quoting *Klem*, 176 Wn.2d at 787). "In short, plaintiffs may demonstrate an unfair act or practice by relying on a variety of factors, outlined in both Washington and federal law." *Id.*

1    The second element asks whether an act "occurred in trade or commerce." *Hangman*, 105

2    Wn.2d at 785. The Legislature has broadly defined the terms "trade" and "commerce" to include

3    "the sale of assets or services, and any commerce directly or indirectly affecting the people of the

4    state of Washington." *Id.* (quoting RCW 19.86.010(2)). "The CPA, on its face, shows a carefully

5    drafted attempt to bring within its reaches *every* person who conducts unfair or deceptive acts or

6    practices in *any* trade or commerce." *Id.* (citation omitted) (emphasis in original).

7    The third element is the public interest. In *Estate of Brantner v. Ocwen Loan Servicing,*

8    *LLC*, the court explained that private disputes can garner public interest if "additional plaintiffs

9    have been or will be injured in exactly the same fashion," as measured by several factors:

10    "(i) whether the alleged acts were committed in the course of the defendant's business;

11    (ii) whether the defendant advertised to the public in general; (iii) whether the defendant actively

12    solicited the particular plaintiff, thereby indicating potential solicitation of others; and

13    (iv) whether the plaintiff and the defendant occupy unequal bargaining positions." No. C17-582

14    TSZ, 2021 WL 3053055, at *12 (W.D. Wash. July 20, 2021) (citing *Hangman Ridge*, 105 Wn.2d

15    at 790–91). The factors "are neither conjunctive nor dispositive; not all need be met and no one

16    factor alone decides the issue." *Id.*

17    The fourth element requires that the plaintiff prove injury to a person's "business or

18    property." RCW 19.86.090. "Nothing in this language requires that the plaintiff must be a

19    consumer or in a business relationship with the actor." *Panag*, 166 Wn.2d at 39. The injuries

20    compensable under the CPA are "relatively expansive." *Frias v. Asset Foreclosure Servs., Inc.*,

21    181 Wn.2d 412, 431, 334 P.3d 529 (2014). The injury requirement may be satisfied by proof that

22    the plaintiff's "property interest or money is diminished because of the unlawful conduct even if

23    the expenses caused by the statutory violation are minimal." *Panag*, 166 Wn.2d at 57 (citation

24    omitted).

ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT - 21

Supreme argues that APM's claim fails because APM "cannot show that Supreme engaged in an unfair or deceptive act that affected the public interest generally." Dkt. 155 at 32. APM alleges that Supreme's actions "'caused confusion for consumers whose loans were in progress with APM,' but there is no evidence Supreme actually deceived any customer at issue." *Id.* (quoting Dkt. 61 ¶¶ 70–72). Supreme argues, APM "cannot show that the Loan Officers' or Supreme's actions had the capacity to deceive substantial portions of the public."[3] *Id.*

In response, APM points to what it claims is "confusion for clients and borrowers whose loans were in progress with APM, or who had submitted applications with APM before their loans were unexpectedly diverted from APM to Supreme." Dkt. 173 at 21–22. Here, APM cites several pieces of evidence that it argues show consumer confusion. *Id.* at 22 (citations omitted). But no reasonable factfinder could conclude the evidence referenced shows any confusion.

First, APM points to an email from a Supreme loan officer to a client. *Id.* (citing Dkt. 173-16). The email states, "I will be working with Matt Thomas and Luke Welling on your mortgage refinance." Dkt. 173-16 at 2. The email was sent on March 24, 2021, before Thomas had officially started working at Supreme. *Id.*; *see also* Dkt. 61 ¶ 15 (start date April 30, 2021). But the email does not show that the clients had any concerns or confusion. *See* Dkt. 173-16 at 2.

APM also points to a thread of messages in which "Condrin texts Welling an elderly APM client's contact information, noting her confusion about transferring her loan application to Supreme." Dkt. 173 at 22 (citing Dkt. 173-5). APM's description of the thread mischaracterizes the messages, implying that the contact did not understand what was happening. *See id.* The messages themselves tell a different story. Condrin texted Welling about the client, "We also need to look at that other one the refi with the ARM pricing. She wants to lock ASAP and I sent

---

[3] Supreme also makes an argument about causation, but, because the Court finds that this argument is dispositive, the Court does not reach the causation question. *Id.* at 33–34.

her the app just waiting on that. She's a bit older and might need some help but we'll get her there. I just want to be able to show her something[.]" Dkt. 173-5 at 16. Condrin does not reference any confusion regarding the switch from APM to Supreme. *See id.* He later sends her contact information to Welling, explaining that "[s]he'd like to chat with you when you can call her" because "[s]he was looking at the app last night and just had a couple of questions. Maybe a little reassurance that she'll still be working with me and the process will be smooth[.]" *Id.* at 17. Condrin informs Welling, "[s]he's old and super sweet. Just talk slow and enunciate[.]" *Id.* at 18. After speaking with her, Welling messaged Condrin to tell her that the call was "great" and she would be "finishing the app soon[.]" *Id.* Condrin replies, "Awesome. I knew she'd like chatting with you. She's just super nervous about everything. Needs hand holding but she's a great client[.]" *Id.* Again, even drawing inferences in favor of APM, this evidence does not show any harm to the client. It shows only that a client required a bit of reassurance about their continued relationship and work with Condrin.

APM finally points to an email from a client to Welling explaining "I've attached the documents requested by your team. I'm sure you are aware, but I started this process over at Element and am moving everything over to Supreme. I was advised to send these directly to you." Dkt. 173-12 at 2. The email, yet again, does not contain any evidence of consumer confusion or harm. Nor does it show that Supreme represented that Thomas was already working at Supreme. *See* Dkt. 173 at 22. APM has offered no evidence in support of its argument that Defendant confused or misled consumers. APM has thus not shown any unfair or deceptive act or practice affecting the public interest.

APM also argues that Supreme and Welling used APM's confidential information to transfer business from APM to Supreme. Dkt. 173 at 22–23. But this alone cannot serve as the basis for an unfair competition claim under the CPA. Conduct that is directed solely at a

competitor rather than the public is unlikely to satisfy the public interest element. *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 744–45, 935 P.2d 628 (1997) (public interest not affected despite tire dealers' tactics to secure dealership expansions). Like other cases involving private disputes between competitors, APM's claim does not qualify. *See, e.g.*, *Broten v. May*, 49 Wn. App. 564, 570, 744 P.2d 1085 (1987) (dispute between competitors was essentially private); *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 742, 733 P.2d 208 (1987) (consumer dispute cases typically involve disputes between a purchaser of goods and a seller or between an individual paying for services and the party rendering them); *see also Fleetwood v. Stanley Steemer Int'l*, 446 Fed. Appx. 868, 869 (9th Cir. 2011) ("there is no violation of the CPA, because, as experienced businessmen, Appellants cannot demonstrate the required public interest"); *Kforce Inc v. Oxenhandler*, No. C14-774 MJP, 2015 WL 1880450, at *5 (W.D. Wash. Apr. 24, 2015) ("This is a private dispute between two competitors, based on contracts signed by the Parties involved, pertaining to restrictive covenants prohibiting certain actions by employees of the two companies. . . . conduct affecting a small portion (four firms) of a niche market (technology specialty staffing firms) does not harm a substantial portion of the general public, especially where the companies do not offer services to the public.").

"Because there has been no showing that the public has been or will be harmed by the conduct alleged here, and no showing that that public would be protected by allowing the CPA claim to proceed," the Court GRANTS summary judgment on APM's unfair competition claim. *See Kforce Inc.*, 2015 WL 1880450, at *5.

**D.    California Computer Data Access and Fraud Act**

Next, Supreme moves for summary judgment on APM's claim under the California Computer Data Access and Fraud Act ("CDAFA"), California Penal Code § 502. Dkt. 155 at 34. Supreme argues that the claim fails for three reasons: 1) California law does not apply to this

case; 2) Supreme was not aware of, nor did it participate in, accessing or using APM's computers; and 3) APM cannot provide evidence of harm to its data or computer systems as required by the law. *Id.*

APM's response does not address the choice of law question. Dkt. 173 at 27. Rather, APM argues "there is a sufficient nexus to California for CDAFA to apply and Defendants cite no precedent that requires a different result." *Id.* at 29. APM also argues that Defendants "directed, facilitated, or at minimum, ratified the Loan Officers improper access to APM's computers[.]" *Id.* at 27. This includes providing the parties a link to send client documents to Supreme, encouraging the Loan Officers to access data without permission, and offering a sign-on bonus for diverted loans. *Id.*

When "a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *see also Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005) (same). APM claims diversity jurisdiction. Dkt. 61 ¶ 10.

"Under Washington law, when parties dispute choice of law, there must be an actual conflict between the laws or interests of Washington and the laws or interests of another state before the court will engage in a conflict-of-laws analysis." *GM Northrup Corp. v. Massachusetts Bay Ins. Co.*, 662 F. Supp. 3d 1180, 1187 (W.D. Wash. 2023) (citing cases). An "actual conflict" exists where the result of a particular issue would be different under the law of the two states. *Id.* (citing *Seizer v. Sessions*, 132 Wn.2d 642, 648, 940 P.2d 261 (1997)). Absent an actual conflict, Washington law applies. *Id.*

If actual conflict exists, the Court applies the "most significant relationship" test. *Singh v. Edwards Lifesciences Corp.*, 151 Wn. App. 137, 143, 210 P.3d 337 (2009). In determining which

1    jurisdiction has the most significant relationship to a particular issue, which in this case is the

2    availability of a private right of action under cybersecurity law, the Court first weighs "(a) the

3    place where the injury occurred, (b) the place where the conduct causing the injury occurred,

4    (c) the domicile, residence, nationality, place of incorporation and place of business of the

5    parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* at

6    143. If these contacts are balanced, the second step is to consider "the public policies and

7    governmental interests of the concerned states." *Id.* at 144.

8         The parties do not dispute that an actual conflict exists. Dkt. 155 at 35; *see* Dkt. 173 at

9    28–29 (arguing that CDAFA applies). CDAFA offers a private right of action. *See, e.g.*,

10   *McGowan v. Weinstein*, 505 F. Supp. 3d 1000, 1020 (C.D. Cal. 2020) ("Sections 502(c)(1) and

11   (e)(1), under which McGowan brings her claim, together create a private right of action[.]");

12   *Capitol Audio Access, Inc. v. Umemoto*, 980 F. Supp. 2d 1154, 1159–60 (E.D. Cal. 2013)

13   (similar). Washington's "equivalent," the Washington Cybercrimes Act (WCA), does not.[4]

14        Because an actual conflict exists, the Court applies the "most significant relationship"

15   test. *Singh*, 151 Wn. App. at 143. Again, the Court weighs four factors to start: "(a) the place

16   where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the

17   domicile, residence, nationality, place of incorporation and place of business of the parties, and

18

_____

19   [4] The parties do not dispute that the WCA does not provide a private right of action.
     Accordingly, the Court does not employ the *Bennett* three-part test to determine whether the
20   statute includes an implied cause of action. *Keodalah v. Allstate Ins. Co.*, 194 Wn. 2d 339, 346,
     449 P.3d 1040 (2019) (discussing *Bennett v. Hardy*, 113 Wn.2d 912, 784 P.2d 1258 (1990)).
21   And, notably, the WCA is a criminal statute. *See* RCW 9A.90.010. "Criminal statutes generally
     do not provide any express private cause of action or other basis for civil liability. . . and the
22   Supreme Court has noted that a private right of action under a criminal statute has rarely been
     implied." *Sweat v. Ferguson*, No. 322CV05531BJRBAT, 2022 WL 4485532, at *2 (W.D. Wash.
23   Sept. 8, 2022), *report and recommendation adopted*, No. 3:22-CV-5531-BJR-BAT, 2022 WL
     4483169 (W.D. Wash. Sept. 27, 2022) (first citing *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th
24   Cir. 1980); and then citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979)).

(d) the place where the relationship, if any, between the parties is centered." *Id.* "These contacts are to be evaluated according to their relative importance with respect to the particular issue" and are to be considered while applying the principles of the Restatement (Second) of Conflict of Laws § 6.4. *Brewer v. Dodson Aviation*, 447 F. Supp. 2d 1166, 1176 (W.D. Wash. 2006). The Court's "approach is not merely to count contacts, but rather to consider which contacts are most significant and to determine where these contacts are found." *Id.* (citation omitted). If these contacts are balanced, the second step is to consider "the public policies and governmental interests of the concerned states." *Id.* at 1185.

As noted above, APM does not address the most significant relationship test. *See generally* Dkt. 173 at 27–29. Instead, APM argues that "Defendants' misconduct is sufficiently connected to California for CDAFA to apply." *Id.* at 28. APM claims that "CDAFA applies because the relevant conduct occurred in California and impacted a plaintiff headquartered in California." *Id.* at 29. As evidence, APM argues that "(i) the Loan Officers accessed multiple databases on servers in California; (ii) all loan lists, including lead or closed loan lists diverted by Loan Officers to Defendants, were housed on Encompass; (iii) Hopkins and Thomas both testified they took closed loan lists from APM before leaving for Supreme; (iv) Condrin admitted to downloading APM's confidential information from Encompass before leaving APM to be able "to service them later"; (v) the Loan Officers accessed APM's database *at Defendants' direction* before leaving APM; (vi) APM's representative, Miller, works in APM's California office alongside APM's President, Dustin Sheppard, Ex. 43; and (vi) Thomas and Welling have NMLS licenses in California." *Id.*

This argument is unpersuasive under the most significant relationship test. The Court begins with the first factor: where the injury occurred. "In the case of personal injuries or of injuries to tangible things, the place where the injury occurred is a contact that, as to most issues,

plays an important role in the selection of the state of the applicable law." *Veridian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1153 (W.D. Wash. 2017) (citation omitted). In cases of "of fraud and misrepresentation, the place of injury is often fortuitous, and 'there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury[.]'" *Bryant v. Wyeth*, 879 F. Supp. 2d 1214, 1221 (W.D. Wash. 2012) (quoting *Kelley v. Microsoft Corp.*, 251 F.R.D. 544 (W.D. Wash. 2008)). Accordingly, "[s]ituations do arise, however, where the place of injury will not play an important role in the selection of the state of the applicable law. This will be so, for example, when the place of injury can be said to be fortuitous . . . or when . . . injury has occurred in two or more states." *Veridian*, 295 F. Supp. 3d at 1153 (quoting *Kelley*, 251 F.R.D. at 552).

And, because of the nature of the case, the Court places more emphasis on the second factor—where the conduct occurred—than on where the injury occurred. *See, e.g.*, *White v. Symetra Assigned Benefits Serv. Co.*, No. 20-1866 MJP, 2022 WL 2983943, at *4 (W.D. Wash July 28, 2022) (finding the location where the conduct causing the injury occurred to be more important because plaintiffs' claims focus on defendants' conduct arising out of Washington); *Balmuccino, LLC v. Starbucks Corp.*, No. 2:22-CV-01501 JHC, 2023 WL 4761447, at *6 (W.D. Wash. July 26, 2023), *aff'd*, No. 23-35561, 2024 WL 4262805 (9th Cir. Sept. 23, 2024) (citing cases) ("Because this action centers on Starbucks's alleged misconduct, the Court views the 'place where the conduct causing the injury occurred' to be a more significant contact than 'the place where the injury occurred.'"). The place of the injury here is fortuitous. On one hand, APM's servers are in California and APM is headquartered there. Dkt. 173 at 29. On the other hand, the harm is the downloading of lead or closed loan lists to allegedly steal clients from APM's Element division in Renton, Washington. *See id.* Thus, the injury occurred in both

California and Washington. Because the injury occurred in two states and is of minimal relevance, the Court looks principally to where the conduct occurred.

The relevant conduct occurred in Washington.  Dkt. 61 ¶¶ 2, 4, 6, 41–44. All the former APM employees worked in the Renton, Washington office, and APM does not allege that any of their actions took place elsewhere. *Id.* ¶ 7.

The parties dispute the applicability of *Farmers Insurance Exchange v. Auto Club Group* here. Dkt. 182 at 17 (citing *Farmers*, 823 F. Supp. 2d 847, 856 (N.D. Ill. 2011)); Dkt. 173 at 26, 28–29. While not controlling, *Farmers* is helpful. In *Farmers*, the parties disputed whether Illinois law or California law, specifically CDAFA, applied. 823 F. Supp. 2d at 856–87. Illinois applies a test identical to Washington's most significant relationship test. *Id.* at 857 (citations omitted). There, even though the company's servers were in California, the court concluded that "the bulk of the unlawful conduct and harm alleged in this case occurred in Illinois." *Id.* at 858. The unauthorized access of the servers could "reasonably be viewed as taking place in either California or Illinois." *Id.* But the use of the allegedly stolen information occurred outside of California—particularly in Michigan and Illinois. Thus, the court concluded that the "conduct" prong of the analysis favored Illinois law. *Id.* And all other factors were either neutral or favored both states.

The Court's analysis here is similar. No one disputes that the servers were in California or that APM is headquartered there. Dkt. 182 at 17. But as Supreme points out, this is only a "faint connection" to the state. *Id.* The Loan Officers were all in Washington and allegedly misappropriated data that caused lost profits to APM's Washington branch. *Id.* The relevant injury and conduct is focused on Washington.

Third, the Court turns to the domicile, residence, nationality, place of incorporation and place of business of the parties. APM is a California corporation. Dkt. 61 ¶ 5. It is a citizen of

ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT - 29

California, with its principal place of business in California. *Id.* The company is authorized to conduct and has conducted business in the State of Washington. *Id.* Element is a division of APM. *Id.* Element has five branches throughout the United States with one branch located in Renton, Washington. *Id.* All of the former employees were, at the time of the events, citizens of Washington. *Id.* ¶ 8; Dkt. 1 ¶¶ 6–12.

Supreme is a resident and citizen of Texas. Dkt. 61 ¶ 7. It is a Texas corporation with its principal place of business in Dallas, Texas. *Id.* Supreme Lending is authorized to and has conducted business throughout multiple branch offices in Washington, including in Renton "where the events giving rise to these claims occurred." *Id.* Defendant Welling is a resident and citizen of the state of Washington. *Id.* ¶ 8. Accordingly, the third factor points to both states.

Fourth, the Court turns to the place where the relationship, if any, between the parties is centered. The parties' relationship "is not centered in any particular place because the parties did not contract with one another." *Kelley*, 251 F.R.D. at 552.

"The court is mindful that it is not to merely count contacts but to consider which contacts are the most significant and where those contacts are found." *Veridian*, 295 F. Supp. 3d at 1154 (citation omitted). Thus, "the court concludes that the place where the alleged conduct occurred which caused the injury is the most significant contact for purposes of the court's choice of law analysis, and that place is Washington." *Id.* at 1155. The court accords "greater weight to the location of the alleged wrongful conduct because the location of the alleged injury is in multiple states and is fortuitous." *Id.*

Accordingly, the state with the most significant relationship to this action is Washington and the Court applies Washington law. APM may therefore not bring its CDAFA claim, and the motion for summary judgment on the CDAFA claim is GRANTED.

1

### E.    Conversion

2       Supreme argues that APM's conversion claim should be dismissed because APM has

3   failed to raise an issue of material fact as to whether Supreme deprived APM of its chattel.

4   Dkt. 155 at 37–38. Supreme argues that the allegedly stolen materials are intangible property and

5   thus not chattel under Washington law. *Id.* Supreme further argues that APM has not identified

6   any property which APM no longer has access to—a requirement of a conversion claim. *Id.*

7       Under Washington law, conversion "occurs when a person intentionally interferes with

8   chattel belonging to another, either by taking or unlawfully retaining it, thereby depriving the

9   rightful owner of possession." *Ocean Beauty Seafoods LLC v. CAPTAIN ALASKA*, 603 F. Supp.

10  3d 1005, 1012 (W.D. Wash. 2022) (quoting *Alhadeff v. Meridian on Bainbridge Island, LLC*,

11  167 Wn.2d 601, 619, 220 P.3d 1214 (2009)). Thus, "the elements of conversion are an

12  unjustified, willful interference with a chattel which deprives a person entitled to the property of

13  possession." *Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083, 1105 (W.D. Wash. 2011)

14  (citing *Potter v. Wash. State Patrol*, 165 Wn.2d 67, 196 P.3d 691, 696 (2008)).

15      "'Chattel' includes both tangible and intangible goods, such as corporate property." *Lang*

16  *v. Hougan*, 136 Wn. App. 708, 718, 150 P.3d 622 (2007); *see also In re Marriage of Langham &*

17  *Kolde*, 153 Wn.2d 553, 566, 106 P.3d 212 (2005) ("[W]e hold that stock options are property

18  and are converted when exercised."). But here, APM has failed to specifically identify any

19  corporate property that was allegedly converted. *See generally* Dkt. 173. APM points to the

20  testimony of Evan Miller, Senior Vice President of Element and the company's 30(b)(6)

21  designee. *Id.* at 30; Dkt. 158-5; Dkt. 126 at 3. APM argues that Miller "identified chattel, here

22  corporate property, that Supreme deprived APM of." Dkt. 173 at 30. And APM claims that

23  Miller's "testimony made clear it could no longer access APM's corporate property after

24  Defendants' conversion." *Id.*

The Court disagrees. As Defendants explain in reply, "Miller recounts generic categories of information he believes were taken or copied, but *nowhere* does he identify any specific information to which APM lost access. Indeed, when pressed, Miller could not identify a single file or piece of data that was lost or became unusable." Dkt. 182 at 19–20 (emphasis in original). Miller's testimony is filled with conclusory allegations. Dkt. 183-3 at 5, 13–14, 22–28. For example, when asked if Miller could identify any documents that APM claimed the employees had deleted from the company's systems or irreparably damaged, Miller could not point to any specifics. *Id.* at 22–23. When pressed, he responded: "As far as for a full ledger of the breadth of that depravity, no, I don't have that available, but I contend that there has been, yes, and that list is pending." *Id.* at 23. When asked what Miller based his claim on, he answered "[r]eal life experience of seeing e-mails with client information that states, these were sent[.]" *Id.* Miller claimed repeatedly that "more research and more information that's needed[.]" *Id.* at 25.

APM points to nothing but this testimony in its opposition. *See* Dkt. 173 at 29–31. At summary judgment, a party cannot promise forthcoming information or argue that "more" is needed. "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted). To carry its burden of production, the movant "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* (citation omitted). If a moving party "carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103 (citing cases).

APM does not point to "any evidence in the record from which we may draw a reasonable inference" that the Defendants converted APM's corporate property. *See Joseph v. City of San Jose*, No. 23-15358, 2024 WL 4144077, at *3 (9th Cir. Sept. 11, 2024). APM has not produced "any evidence that it was not in full possession of the information" on its servers at any point. *See Calence, LLC v. Dimension Data Holdings*, No. C06-0262RSM, 2007 WL 1526349, at *7 (W.D. Wash. May 23, 2007). In fact, APM has not pointed to a single piece of its property that was misappropriated. *See* Dkt. 173 at 29–31. "Such lack of evidence is fatal to [APM's] claim." *See Calence*, 2007 WL 1526349, at *7; *see also LaRoche v. Smith*, No. C15-1003 TSZ, 2016 WL 1365951, at *3 (W.D. Wash. Apr. 6, 2016) (dismissing conversion claim where the plaintiff had not "identified any personal property or money that [the defendants] allegedly converted.").

Thus, the motion for summary judgment is GRANTED as to APM's conversion claim.

**F.    Conspiracy**

Supreme argues that APM's conspiracy claim fails because APM's underlying torts based on the alleged misuse of APM's confidential information and improper recruiting fail. Dkt. 155 at 23–24. APM responds that "Defendants conspired with the APM Conspirators to act as agents of Supreme during their employment with APM, induce other APM-employees to resign and join Supreme, and divert confidential business and information from APM to Supreme. . . . APM's conspiracy claim is further cognizable because the underlying claims, including its tortious interference and unfair competition claims, are actionable." Dkt. 173 at 21.

To establish civil conspiracy, a plaintiff "must prove by clear, cogent, and convincing evidence that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy." *Puget Sound Sec. Patrol, Inc. v. Bates*, 197 Wn. App.

461, 470, 389 P.3d 709 (2017). "Because the conspiracy must be combined with an unlawful purpose, civil conspiracy does not exist independently—its viability hinges on the existence of a cognizable and separate underlying claim." *Gossen v. JPMorgan Chase Bank*, 819 F. Supp. 2d 1162, 1171 (W.D. Wash. 2011).

As explained above, APM's tortious interference claim fails as to any loans not included in the pool of identified diverted loans. And APM's unfair competition claim fails because it has provided no evidence of an unfair or deceptive act affecting the public interest. Accordingly, APM's conspiracy claims fails as to these claims because the company has failed to adequately allege an actionable underlying act or claim. *NW Monitoring LLC v. Hollander*, 534 F. Supp. 3d 1329, 1340 (W.D. Wash. 2021) (citing *Nw. Laborers-Emps. Health & Sec. Tr. Fund v. Philip Morris, Inc.*, 58 F. Supp. 2d 1211, 1216 (W.D. Wash. 1999)) ("In Washington . . . a civil conspiracy claim must be premised on underlying 'actionable wrongs,' 'overt acts,' or a 'tort working damage to the plaintiffs. A conspiracy claim fails if the underlying act or claim is not actionable.").

Thus, Defendants' motion is GRANTED as to APM's conspiracy claim, to the extent it goes beyond the underlying tortious interference claim for the specific diverted loans.

## G. Punitive Damages

Finally, Supreme argues that APM is not entitled to punitive damages. Dkt. 155 at 39. Supreme claims, first, that punitive damages are not available for APM's common law claims. *Id.* Second, Supreme claims that APM has no grounds for punitive damages under CDAFA. *Id.* at 39–40.

The Court starts with the CDAFA-related punitive damages. Dkt. 61 ¶ 95. The Court has dismissed the CDAFA claims, finding that Washington law applies. *See supra*, Section IV.D. Accordingly, punitive damages under CDAFA are no longer available to APM.

Similarly, while APM may have access to treble damages under Washington's CPA for the unfair competition claim, RCW 19.86.090, that claim too has been dismissed. *See supra*, Section IV.C.

The Court turns to APM's common law claims. Supreme argues that punitive damages are not available under Washington common law. Dkt. 155 at 39; Dkt. 182 at 21–22. In response, APM does not claim that Washington common law allows for punitive damages. Dkt. 173 at 31. Rather, APM simply maintains that a "motion for summary judgment is not the proper procedural stage to address the question of punitive damages." *Id.* (citing cases). In some cases, that may be true. *See id.* (citing cases). But the question here is purely a legal one: whether punitive damages are available under Washington law.

Under Washington law, punitive damages are not available unless authorized by statute. *Dailey v. N. Coast Life Ins. Co.*, 129 Wn. 2d 572, 574, 919 P.2d 589, 590 (1996) ("Since its earliest decisions, this court has consistently disapproved punitive damages as contrary to public policy"). This principle has been affirmed repeatedly for decades. *See, e.g.*, *Puget Soundkeeper All. v. APM Terminals Tacoma LLC*, 574 F. Supp. 3d 903, 910 (W.D. Wash. 2021*)*; *Pac. 5000, L.L.C. v. Kitsap Bank*, 22 Wn. App. 2d 334, 348, 511 P.3d 139 (2022) ("Washington prohibits punitive damages as a matter of public policy unless expressly allowed by statute.") (citing *Dailey*, 129 Wn.2d at 574–75).

Accordingly, the motion for summary judgment is GRANTED as to APM's claim for punitive damages.

## V.    CONCLUSION

For these reasons, the Court GRANTS Defendants motion for partial summary judgment, Dkt. 155. The following claims are DISMISSED in whole:

1) Violations of CDAFA;

2) Unfair Competition;

3) Conversion; and

4) Punitive Damages.

The remaining claims are DISMISSED as to all but the eleven diverted loans:

1) Tortious Interference with Contract, and related lost profits;

2) Tortious Interference with Business Expectancy, and related lost profits; and

3) Conspiracy.

Dated this 20th day of June, 2025.

Tiffany M. Cartwright
United States District Judge